UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATIE REDMOND, Personal Representative
of the Estate of Herbert Redmond, deceased,

                        Plaintiff,                        Case Number 15-10466

v.                                               Honorable David M. Lawson

UNITED STATES OF AMERICA,

                        Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO PROHIBIT PLAINTIFF'S PROPOSED EXPERT WITNESSES FROM TESTIFYING AND FOR SUMMARY JUDGMENT

Herbert Redmond's estate sued the United States under the Federal Tort Claims Act, alleging that medical personnel at the Detroit Veterans Administration Hospital committed medical malpractice in diagnosing and treating his liver cancer, which took his life. After discovery closed, the United States filed motions to exclude the plaintiff's proposed expert witnesses and for summary judgment. The Court heard oral argument on those motions on May 11, 2016. The summary judgment motion depends largely on the government's success in preventing the plaintiff's standard-of-care and causation experts from testifying. However, because those witnesses have provided an adequate basis to support their opinions, and the late disclosures by plaintiff's counsel are harmless, the government's motion to exclude the experts will be denied. And because the testimony of those witnesses establishes a genuine issue on the material facts of the case, summary judgment likewise will be denied. The case will proceed to trial.

I.  Factual Background

On July 7, 2013, the plaintiff's decedent, Herbert Redmond, died at the age of 52 after receiving inpatient treatment for hepatocellular metastatic liver cancer at the Karmanos Cancer Center in Detroit, Michigan.  Before he was diagnosed with liver cancer, Redmond had been seen several times over the preceding twelve years by staff at the Detroit Veterans Administration (VA) Hospital.  Redmond's medical records indicate that he first visited the hospital as early as 2001, and again in 2002.

The plaintiff's theory of liability is that Redmond's liver cancer was directly related to a Hepatitis B infection, which had been detected though blood tests at the VA Hospital but remained untreated.  The plaintiff posits that if Redmond had been informed of the infection, it could have been suppressed or eliminated with medical treatment.  And if the virus were not destroyed, Redmond would have been monitored, and his liver cancer would have been detected at an earlier stage, and he could have survived the disease with appropriate and timely treatment.

Redmond's medical records from the VA Hospital show that on December 13, 2006, blood tests indicated that Redmond had Hepatitis B.  However, he was not informed of that fact, and no follow-up treatment was ordered based on the positive Hepatitis B test.  The government posits that Redmond knew he had Hepatitis B several years earlier, based on the surmise of Dr. Wilma Henderson, who saw Redmond in the fall of 2002.  Dr. Henderson, who formerly worked at the VA Hospital, stated in a declaration that she conducted an initial assessment of Redmond on September 4, 2002.  She stated that "[t]he reference to 'HEP B' in [my treatment notes] indicates that, at the September 4, 2002 visit, Mr. Redmond had a history of Hepatitis B infection."  Dr. Henderson also noted that the "VA medical records prior to Mr. Redmond's September 4, 2002, visit do not indicate

-2-

any diagnosis or treatment for Hepatitis B." Based on those facts, Dr. Henderson inferred that "the only available source for Mr. Redmond's history of Hepatitis B infection [at that time] would have been what Mr. Redmond told me about his medical history during the visit."

Nonetheless, when Redmond visited the VA Hospital in December 2006, and when he returned in later years, Redmond was seen at each of his appointments by Sheila D. Behler, R.N., who told him at his December 13, 2006 visit that his lab results were "normal." She admits that assessment was incorrect, because the tests in fact showed that Redmond had Hepatitis B. Redmond saw Behler again on October 29, 2008, in February 2009, and in March 2010. Behler concedes that the relevant standard of care would require her to review the record of past medical tests and treatment at each later visit, and that she had an opportunity at each of the following appointments between 2006 and 2009 to discuss Redmond's positive Hepatitis B test results with him. However, she admitted that she does not remember ever discussing the test results, and there was no indication in Redmond's medical records that she ever informed him that he had Hepatitis B at any time before 2013. Behler testified that, as a nurse, her appropriate response to a positive Hepatitis B test would have been to consult with her "collaborating physician" at the hospital, and that the usual follow-up treatment would have included a CAT scan or ultrasound and a referral to the GI Clinic or to other specialist providers for further treatment. On March 29, 2013, Behler made the following "clinical disclosure note" in Redmond's file:

> Called patient per his request to review testing results. I advised him he does have hepatitis B. See provider note same day. And that he had a positive test result in 2006, which I did not follow up regarding i.e. further testing. I apologized regarding this and assured him regarding his ongoing care at VAMC regarding this.

In March and April 2013, more lab tests were performed that confirmed the Hepatitis B diagnosis, and abdominal and liver CT scans showed that Redmond had a mass in his liver. Further testing

revealed that the mass was hepatocellular cancer, which had spread to Redmond's lungs. Redmond was admitted to the Karmanos Cancer Center and received radiation therapy for his cancer, but he succumbed to the disease and died in early July.

The plaintiff, Redmond's widow, submitted an administrative tort claim (SF-95) to the Veterans Administration on June 23, 2014. After the agency denied her claim, she filed her complaint in this case on February 5, 2015. The plaintiff was required to complete her expert disclosures by December 1, 2015. Discovery closed on February 1, 2016. The plaintiff disclosed reports for two of her experts after the deadline; the Court allowed the government to file a late motion challenging those experts.

## II.  Motion to Exclude Expert Testimony

The government has filed two motions to strike the plaintiff's expert witnesses, one based on a procedural default and the other based on a substantive argument. The plaintiff proposes to offer three expert witnesses: Bruce Bacon, M.D., a physician who specializes in treating liver diseases; Susan Cass, a registered nurse, who intends to testify as to the applicable standard of care for a nurse in a clinical setting when treating patients who have positive lab test results indicating an infection with Hepatitis B; and Michael Thompson, Ph.D., an economist who intends to quantify the plaintiff's economic damages.

### A.  Rule 37 Challenge

In its first motion challenging experts, the government argues that the testimony of Dr. Bacon and the plaintiff's (then) unnamed economic damages expert must be excluded at trial under Federal Rule of Civil Procedure 37(c)(1), because the plaintiff did not timely disclose signed expert reports for those witnesses, despite repeated notices by counsel for the government that the

-4-

disclosures that were provided were tardy and insufficient. The government contends that the failure to make timely disclosures was not harmless because the attorney for the plaintiff offers no justification to explain why the reports were delivered late, and the materials that were provided before the deadline did not contain sufficient factual matter and other information to allow for proper examination of the plaintiff's experts and adequate preparation for their depositions. The government contends that, even though it did finally receive the report of the plaintiff's causation expert on February 23, 2016, that disclosure did not allow sufficient time for its attorney adequately to review the literature on the drugs mentioned in the report as possible treatments for Hepatitis B or to consult with the government's own expert prior to the deposition.

The plaintiff's attorneys offer no excuse for their tardy disclosures. However, they contend that, notwithstanding the late disclosures, the government was provided adequate information about Dr. Bacon's testimony throughout December 2015 and January and February 2016, before Dr. Bacon's discovery deposition was taken. The plaintiff asserts that by the December 1, 2015 disclosure deadline Dr. Bacon's identity and a summary of his testimony was supplied; by January 4, 2016, a supplemental disclosure supplied additional information including Dr. Bacon's curriculum vitae and details about his testimony, along with a description of the information on which his opinions would be based; and on January 26, 2016, before the close of discovery and well before Dr. Bacon's February 25, 2016 deposition, the plaintiff supplied the government with Dr. Bacon's fee schedule and a list of his trial testimony for the past four years. As to her economic damages expert, the plaintiff asserts that the information relied upon and calculations performed were nothing more than a rote actuarial evaluation of numbers from the decedent's recent wage statements and tax returns, based on published government life expectancy and occupational outlook data, which

could have been performed by any expert available to the government using the same conventional techniques. The plaintiff furnished signed expert reports for both witnesses on February 23, 2016.

Under Federal Rule of Civil Procedure 37(c)(1), the Court must exclude a witness from testifying "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) "requires absolute compliance with Rule 26(a); that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Vance v. United States*, No. 98-5488, 1999 WL 455435, at *3 (6th Cir. June 25, 1999)).

But "[a]lthough exclusion of late or undisclosed evidence is the usual remedy for noncompliance with Rule 26(a) or (e), Rule 37(c)(1) provides the district court with the option to order alternative sanctions 'instead of' exclusion of the late or undisclosed evidence 'on motion and after giving an opportunity to be heard.'" *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015) (quoting Rule 37(c)(1)); *see also Roberts*, 325 F.3d at 783-84 ("Rule 37(c)(1) does not compel the district judge to exclude testimony in its entirety."). "The Advisory Committee Notes to the 1993 Amendments (including Rule 37(c)(1)) strongly suggest[] that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Howe*, 801 F.3d at 747 (quotations and alterations omitted).

In order to assess whether a party's late disclosure is "substantially justified" or "harmless," the Sixth Circuit considers five factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing

-6-

the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing

party's explanation for its failure to disclose the evidence. *Id.* at 747-48 (citing *Russell v. Absolute*

*Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)).  Weighing those factors in this case

results in a conclusion that preclusion ought not occur, although remedial measures at the plaintiff's

expense are called for.

     *First*, the surprise in this case was troublesome, but not extreme, considering the information

that the government received before the date scheduled for Dr. Bacon's deposition.  The government

timely filed its motion for summary judgment arguing that the malpractice claim should be

dismissed for lack of admissible expert testimony to sustain the causation element.    It

contemporaneously filed a motion to exclude Dr. Bacon's testimony premised solely on the

plaintiff's failure up to that point to make an adequate expert disclosure.  Eleven days after those

motions were filed, the plaintiff delivered signed expert reports for Dr. Bacon and Michael

Thompson.  The government does not contend that those reports were deficient in form or failed to

supply all of the information required by Rule 26(a)(2)(B).  Dr. Bacon was deposed two days after

his report was disclosed.  It does not appear that the parties deposed Mr. Thompson, or that either

desires to do so.

     Although the time from disclosure to examination was short, it afforded the government an

opportunity, pressed though it was, to examine Dr. Bacon on the content of his report at the

deposition.  Moreover, it appears from the extensive critique of Dr. Bacon's opinions set forth in the

government's second expert motion that its counsel made good use of the time that was allowed, and

mounted a searching inquiry on the record.  Nonetheless, counsel for the government suggests that

he did not have sufficient time before the deposition to conduct medical research or consult with his

own expert on matters that apparently were revealed in Dr. Bacon's formal report for the first time. To fill that gap, the Court will permit a second deposition of Dr. Bacon at the plaintiff's expense.

*Second*, the parties had, and still have, substantial time and opportunity to cure any "surprise" caused by the late disclosures. The Court already has granted the government's request to file a second motion challenging Dr. Bacon's testimony, and the government took advantage of that allowance to mount a substantive attack on his qualifications and the reliability of his methods. Moreover, although the government has raised additional reasons for excluding Dr. Bacon's testimony, it has not made any request to amend its motion for summary judgment; the basic premise of that motion (in part) remains its argument that the malpractice claim cannot be sustained for want of any admissible expert testimony on causation. The government seems to have made good use of the time afforded by the Court to remedy any surprise resulting from the late disclosure, and to develop an extensive substantive attack on Dr. Bacon's opinions. It contends that it had limited time to prepare for Dr. Bacon's deposition, but that legitimate complaint is addressed above, and the Court has provided a remedy.

*Third*, no disruption to the trial resulted, or will result, in this case from the late disclosure. If the government feels that additional steps must be taken to remedy any lingering uncertainty it may have in addressing Dr. Bacon's testimony at trial, ample time remains to take them without affecting the scheduled trial date.

*Fourth*, because causation is an essential element of the malpractice claim, the evidence is of critical importance to the resolution of this case, and omitting otherwise admissible expert testimony on this subject that would be helpful to the factfinder would seriously compromise the balance of the trial presentations.

-8-

*Fifth*, the plaintiff has offered nothing to explain why she could not make timely disclosures in this case. However, although this factor does not weigh in the plaintiff's favor, it also does not weigh against her, since nothing in the record indicates that she withheld her experts' reports with any intent to obstruct the government's defense of the case.

Under the circumstances that exist on this record, and considering all of the relevant factors, the late disclosure of the plaintiff's causation and economic damages experts was harmless. Their testimony will not be excluded on that basis. But the plaintiff must make Dr. Bacon available to the defendant for a second deposition at a time and place that is mutually agreeable to the parties. The plaintiff must bear the expenses of that deposition, including the professional fees of Dr. Bacon and the travel expenses of government counsel. The plaintiff may not schedule the *de bene esse* deposition of Dr. Bacon at the same time, but must allow a sufficient time before the *de bene esse* deposition (if the plaintiff chooses to proceed in that fashion) to allow defense counsel to digest the information obtained in the second discovery deposition.

### B. *Daubert* Challenge

The government also mounts a substantive attack on the proposed testimony of Dr. Bacon and Nurse Susan Cass. In its second motion challenging experts, the government argues that Dr. Bacon's testimony must be excluded because (1) he concedes that certain guidelines published by the American Association for the Study of Liver Diseases (AASLD) applied to the treatment of the decedent's liver disease, but Dr. Bacon admits that he did not review those guidelines before his deposition, and he cannot explain why treatment would be needed when it would not be indicated under the guidelines based on the lab results disclosed in the medical records; and (2) Dr. Bacon is not qualified to offer any opinion about what caused the decedent to get liver cancer or how long

he had the cancer before it was detected, because Dr. Bacon is not an oncologist and therefore lacks expertise in the diagnosis and treatment of liver cancer.

The government also argues that Nurse Cass is not qualified to testify regarding the "local community standard of care" for a nurse working at the VA Hospital in Detroit, Michigan, because she has never worked in Detroit and never been licensed in the State of Michigan, and her clinical experience was in dissimilar settings such as a student health center at a university.

Any challenge to expert testimony must begin with Rule 702 of the Federal Rules of Evidence, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge.  Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The language added by the amendment to Rule 702 restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

-10-

In addition, expert testimony is not admissible unless it will be helpful to the faactfinder. Such testimony is unhelpful when it is unreliable or irrelevant, as the Court observed in *Daubert*, *see id.* at 591-92, and also when it merely deals with a proposition that is not beyond the ken of common knowledge, *see, e.g., Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) ("If everyone knows this, then we do not need an expert because the testimony will not 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting Fed. R. Evid. 702). Finally, before an expert may give an opinion, the witness must be qualified to do so. *See id.* at 1348-50; *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998). The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

### 1. Dr. Bacon

The main thrust of the government's criticism of Dr. Bacon's opinion is that it does not give proper deference to the AASLD guidelines. Much of the government's brief in support of its motion is devoted to a minute analysis of the decedent's medical records and numerous sources from the literature that it says support its position that treatment for the decedent's liver disease was not warranted under the circumstances, and, therefore, failing to treat the liver disease was not negligent. The government asserts that Dr. Bacon's only function was to review, interpret, and apply the AASLD guidelines to the facts of the case, because that is what the VA Hospital would have (should have?) done. But, the government insists, Dr. Bacon cannot properly have applied guidelines that he admits he did not review before forming his opinion. The government argues, therefore, that his testimony is the product of unreliable methods and must be excluded.

-11-

An opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert*, 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results. And there is no precise formula by which a court might deem a methodology "acceptable" or "unacceptable." *Daubert* and its progeny have therefore not created a "straitjacket," *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001), but rather counsel a flexible approach, reconciling the "liberal thrust" of Rule 702 which "relax[es] the traditional barriers to opinion testimony" with the responsibility to "screen[] such evidence" in order to keep unreliable or invalid opinions from the factfinder. *Daubert*, 509 U.S. at 588-89; *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000); *see Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009) (observing that red flags that caution against certifying an expert include reliance on anecdotal evidence, reliance on temporal proximity, lack of sufficient information about the actual case, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity).

"Although there is no 'definitive checklist or test' to strike th[e] balance ['between a liberal admissibility standard for relevant evidence . . . and the need to exclude misleading junk science'], the *Daubert* Court set forth factors relevant to the inquiry: (1) whether the theory or technique can be or has been tested; (2) whether it 'has been subjected to peer review and publication'; (3) whether there is a 'known or potential rate of error'; and (4) whether the theory or technique enjoys general acceptance in the relevant scientific community." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011); *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). Other factors may play a role as well. *See Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 712-13 (E.D. Mich. 2003). An expert's opinion relating to specific technologies, processes,

-12-

or mechanisms at issue in the case will not necessarily be precluded because the expert lacks training

or experience with those particular subjects, where the expert's opinion as to the operation or effect

of specific mechanisms is based on the application of generally accepted principles of his discipline

and flow from his investigation of the facts of the case. *Id.* at 714.

"[R]ejection of expert testimony is the exception, rather than the rule, and [the court] will

generally permit testimony based on allegedly erroneous facts when there is some support for those

facts in the record." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008)

(quotations and citations omitted).

Dr. Bacon's proposed expert testimony is sufficiently relevant, reliable, and supported by

information in the record to be admitted at trial for the purpose of aiding the factfinder in deciding

whether the failure of the defendant's medical staff adequately to treat and monitor the decedent's

liver disease, and the resulting late stage detection of his liver cancer, caused his untimely death.

The government does not assail Dr. Bacon's qualifications generally as a medical doctor or a

specialist in hepatology, gastroenterology, internal medicine, or the treatment and management of

liver disease generally and Hepatitis B in particular. Instead, it attacks several isolated aspects of

his opinions and questions: (1) whether treatment of a known Hepatitis B infection with antiviral

agents would have lessened the chance of the decedent developing liver cancer; (2) whether that

treatment would have been recommended and provided by medical professionals following the

applicable standard of care; and (3) whether closer monitoring of the decedent's liver condition by

ultrasound or other imaging methods would have resulted in earlier detection of the liver tumor and

a corresponding improvement in his prognosis.

-13-

Dr. Bacon is qualified by his medical training and experience to opine on all of the issues discussed above. In addition to his general medical training, he has extensive specialized experience treating patients with liver disease including those with Hepatitis B, and, further, those who develop liver cancer as a result of that disease. The government offers nothing in the way of expert testimony or literature to refute Dr. Bacon's testimony that the causal link between Hepatitis B and liver cancer is documented in the medical literature and widely accepted by practitioners. Dr. Bacon testified that in his current clinical practice he follows between 150 and 200 patients at a time who have Hepatitis B, and that his duties include developing and overseeing treatment plans to address their disease, as well as referring them for other appropriate care. Moreover, Dr. Bacon testified that his practice involves "diagnos[ing] patients with hepatocellular carcinoma and [caring] for them while they're being taken care of for treatment by either oncologists or by transplant or interventional radiology." Bacon dep. at 8. Dr. Bacon also testified that he individually is responsible for deciding what specific treatment his patients should receive for liver disease and liver cancer, and for coordinating the care needed to ensure that it is delivered according to the plan that he determines. That experience well qualifies him to opine, based on his experience, about the outlook for patients who are and are not treated for liver disease, and the chances that such patients subsequently will develop liver cancer. Dr. Bacon's close supervision of such patients throughout their treatment for and recovery from liver disease and liver cancer provides him with a sufficient basis to render an opinion on whether the decedent's cancer could have been detected earlier than it was, and, if it had been, whether his chances of survival would have been higher. As Dr. Bacon testified:

> [The decedent] would have been appropriately monitored because [the] guidelines are very solid, with either ultrasound or CT scan, they would have done an HBV

DNA, they would have treated him. So — And if a cancer would have arisen, it would have been found out early and could have been treated.

So when does that — when is the latest period of time that that early finding cancer could be identified is kind of your question. And I would say probably by 2011 — 2010 to 2011. So by 2012, I suspect that he had — he clearly had hepatocellular cancer because he presented with a very large tumor burden.

Bacon dep. at 66.

Dr. Bacon also offered sufficient testimony to establish that his views on the need for treatment of liver disease, and the causal connection between liver disease and liver cancer are widely accepted by practitioners and well established in the literature. In particular, Dr. Bacon testified that even though Redmond's lab results may have indicated normal levels of liver enzymes shortly after his abnormal results, Dr. Bacon "would have treated him [for Hepatitis B] and most hepatologists I know would have treated him." Bacon dep. at 77. The government may have an expert who feels otherwise, but the plaintiff's expert's testimony that other practitioners in his field would have followed the course he recommends is sufficient, if the Court finds it credible, to make his opinion adequately reliable to be taken into evidence at trial.

The government's brief in support of its *Daubert* challenge to Dr. Bacon reads as a well composed and thorough point-by-point script for an able and incisive cross-examination of his testimony at trial, and it notes numerous ways in which the particulars of his opinions could be questioned on the basis of the relevant literature. Nothing in it, however, demonstrates that Dr. Bacon's testimony is so unreliable or unfounded that it should be entirely excluded. In particular, the government's argument that Dr. Bacon's opinion is unreliable because he failed to review or apply guidelines published by the American Association for the Study of Liver Disease (AASLD) is misplaced. It is based on the assumption that physicians at the VA Hospital would cleave to those

-15-

guidelines and follow them by rote and without deviation, and that such adherence would have lead to the same treatment and outcome that actually occurred in this case. The criticism that Dr. Bacon did not review those guidelines to form his opinion may be well founded, but it properly bears on the weight of Dr. Bacon's testimony, not its admissibility.

Dr. Bacon's testimony apparently will be offered primarily on the question of causation. However, it may also be relevant to establish the applicable standard of care, if the government insists that such a standard for treating Hepatitis B consists of the AASLD Guidelines and nothing else. Under Michigan law, which governs the substantive tort claim here, *see* 28 U.S.C. § 1346(b)(1) (establishing liability for conduct by a federal employee "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"), professional negligence must be covered at trial by the testimony of the parties' experts, not by mere reference to "guidelines." *Elher v. Misra*, 499 Mich. 11, 24, 878 N.W.2d 790, 796 ( 2016) (holding that where the "breach of the standard of care is [not] so obvious to a layperson that no expert testimony is required, . . . *expert testimony [will be needed] to prove the applicable standard of care and a breach of that standard of care*") (emphasis added). In this case, when asked if he would have given treatment even though the AASLD Guidelines would not indicate it, Dr. Bacon replied that the guidelines do not dictate what care should be given in every situation. As Dr. Bacon put it, "That's why they're guidelines. They're not dogma." Bacon dep. at 77-78. Dr. Bacon further testified that guidelines produced by different organizations sometimes give conflicting indications for the same patient, and there are in some cases differences of opinion among practitioners as to whether treatment should be given or not. *Id.* at 78.

-16-

The government's briefing suggests that it may have substantial countervailing information at its disposal that it may use to attack that testimony and to suggest that the AASLD guidelines better represent the prevailing standard of care relevant to the decedent's condition, and would have been applied in Redmond's case had his Hepatitis B been diagnosed properly. But the fact that the government's expert and the plaintiff's disagree as to the particulars of the standard of care that applied to the decedent's condition does not establish that the testimony of either witness is unsuitable for presentation at trial.

### 2. Nurse Cass

The government has not challenged Nurse Cass's qualifications or experience generally as a registered nurse or nurse practitioner, and it contends only that she is unqualified to testify as to the relevant standard of care because she has no experience as a hospital nurse at a VA Hospital in Detroit, Michigan and never has been licensed in this state.

In response to the government's contention that Nurse Cass is not competent to comment on the local standard of care, the plaintiff argues that expert testimony regarding the standard of care without regard to geographical location is allowed as long as the expert supplies a sufficient foundation to establish that the standard of care under the circumstances would be the same for any nurse working anywhere in the country, faced with a patient in the same condition. The plaintiff supplied an affidavit by Nurse Cass stating that, based on her experience and education, there would be no difference in the standard of care applicable to a nurse in Detroit, Michigan versus one in Columbia, Missouri — or anywhere else in the country — with regard to the duty to inform a patient of a positive Hepatitis B test, or the duty to refer the patient for further treatment and follow-up care by appropriate specialist treaters.

-17-

The record discloses that Nurse Cass amply is qualified as a hospital and clinical nurse with decades of experience, with recent clinical practice that includes treating patients with infectious diseases such as Hepatitis B, including ordering tests, informing patients of the results, and referring patients for specialized care from other medical providers.

Where a medical expert witness offers well founded testimony that the applicable standard of care concerns such commonplace issues as whether to notify a patient of a positive test result for a serious disease and whether to refer the patient for appropriate follow-up care, and that the standard would be the same for any practitioner regardless of geographic location or setting, then the testimony is proper and may be allowed at trial to establish the relevant "community standard of care," which is, in that instance, the same in any local community. As the Michigan Court of Appeals has explained, an expert testifying as to the standard of care for a nurse may establish by the expert's own testimony that the standard of care essentially is the same in any community, for any nurse:

> [T]he actual substance of [Nurse] Wolff's lengthy testimony was that the procedures at issue here are so commonplace that the same standard of care applied locally and nationally. In other words, for example, no matter where a nurse is practicing: (1) central lines must be monitored and evaluated for patency, as well as utilized correctly, (2) particularized care must be given to a patient on the basis of the patient's medical condition, (3) physician orders must be followed, and (4) nurses must record, apprise, and report to physicians and other providers significant changes in a patient's condition, as well as record such verbal communications. Thus, plaintiff's expert applied the proper standard of care, which happened to be the same locally as well as nationally.

*Decker v. Rochowiak*, 287 Mich. App. 666, 686-87, 791 N.W.2d 507, 519 (2010). Here, the government has not offered any testimony to rebut Nurse Cass's assertion that the relevant standard of care concerns such basic issues that it would be the same for any nurse, anywhere, regardless of geographic location. And even if such testimony were available, it would not outright disqualify

this witness.  Instead, it would constitute a challenge to the proper weight to be accorded to her testimony.  The government therefore has not established that Nurse Cass has failed to identify the relevant standard of care or is incompetent to attest to it.

The motions to exclude the plaintiff's expert witnesses will be denied.

### III.  Summary Judgment Motion

The government argues that it is entitled to judgment as a matter of law on the plaintiff's claims on three grounds.  *First*, the government argues that the plaintiff's claim is time-barred under the FTCA statute of limitations, because Redmond failed to present any administrative complaint for medical negligence until more than ten years after his claim accrued.  *Second*, the government argues that the claim for medical malpractice fails as a matter of law because (for the reasons further developed in the government's motions to exclude experts), the plaintiff has not offered any admissible evidence to show that her decedent's liver cancer was caused by the defendant's failure to treat his liver disease.  *Third*, the government argues, based on a treatment note from 2002, that the decedent knew that he had Hepatitis B as early as 2002, and that his failure to seek treatment for the disease at any time during the following twelve years contributed more to his untimely demise than anything the defendant's medical staff did or failed to do, rendering the plaintiff's decedent more than 50% at fault for his injury.  The plaintiff responds that all of these arguments require a determination of facts, which cannot be decided summarily.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a

sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the [factfinder] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable [factfinder]

-20-

could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

### A.  Statute of Limitations

The government's statute of limitations argument is based on the premise that the plaintiff's claim accrued in 2002.  The government contends that (1) medical records indicate that Redmond was aware that he had Hepatitis B then, and he also knew that he had received no treatment from the defendant or its medical staff for the disease up to that time; (2) the decedent was required to present an administrative claim to the agency within two years after it accrued, but he never brought any administrative claim based on the alleged medical negligence until June 23, 2014; and (3) the claim therefore plainly is time-barred under the FTCA and must be dismissed.  The plaintiff responds that the malpractice claim did not accrue in 2002, because there is no evidence that at that time Redmond knew or had any reason to know before 2013 that he had Stage IV liver cancer, which is the injury that he suffered as a result of the failure by defendant's medical staff properly to monitor and treat his Hepatitis B liver disease.

The Federal Tort Claims Act (FTCA) states that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  "The FTCA bars a tort claim against the United States unless first presented to the appropriate federal agency 'within two years after such claim accrues.'" *Amburgey v. United States*, 733 F.3d 633, 636 (6th Cir. 2013) (citing *United States v. Kubrick*, 444 U.S. 111, 113 (1979); quoting 28 U.S.C. § 2401(b)).

"Although the FTCA does not define when a claim 'accrues,' the Supreme Court has held that a plaintiff's medical-malpractice claim accrues when he 'knows both the existence and the cause of his injury.'" *Ibid.* (quoting *Kubrick*, 444 U.S. at 113). The plaintiff's claim for malpractice accrues therefore when he is "in possession of the critical facts that he has been hurt and who has inflicted the injury." *Kubrick*, 444 U.S. at 122. The Sixth Circuit "has recognized, however, that in 'medical-malpractice cases in which the plaintiff has little reason to suspect anything other than natural causes for his injury, a plaintiff might need to know, or have reason to know, of doctor-caused harm (though not necessarily *negligently* doctor-caused harm) in order for his claim to accrue.'" *Amburgey*, 733 F.3d at 637 (quoting *Hertz v. United States*, 560 F.3d 616, 619 (6th Cir. 2009)).

The government has not pointed to sufficient evidence in the record to establish without question that the plaintiff's decedent knew or had reason to know that he had Hepatitis B at any time before 2013. The government contends, on the basis of a single treatment note in the decedent's records from 2002, that Redmond had Hepatitis B at that time, and knew that he had it, and that, therefore, any claim he had for failure to treat the disease "accrued" in 2002, contemporaneously with his knowledge of the disease and lack of any treatment. That argument is flawed for two reasons. *First*, the record evidence does not inescapably compel the conclusion that the government proposes. Dr. Wilma Henderson testified that she had no actual memory of Redmond's visit to the VA Hospital in 2002, but that "[t]he reference to 'HEP B' in [my treatment notes] indicates that, at the September 4, 2002 visit, Mr. Redmond had a history of Hepatitis B infection." *Id.* ¶ 12. That note, in itself, does not compel the conclusion that the decedent actually had the disease at that time; it states only that he reported having a "history" of Hepatitis B infection. Moreover, as the

-22-

government vigorously expounds in its briefing on the motions to exclude experts, Hepatitis B in many cases resolves itself without any treatment. Therefore, even if the plaintiff was positive for Hepatitis B in 2002, it does not necessarily follow that his demise in 2013 ineluctably flowed from that bout with the virus. The note and Dr. Henderson's testimony may support the inference the government urges, but the opposite inference is just as likely, and the Court at this stage of the case must "draw all reasonable inferences in favor of the [plaintiff]." *Alexander*, 576 F.3d at 557.

*Second*, even if the decedent had Hepatitis B in 2002, that is immaterial to the determination of when his claim accrued, because the claim here is based on his ensuing death due to liver cancer, not any harm due to the preceding liver disease. The government has not offered any evidence to suggest that the decedent knew, or had any reason to know, before March 2013, that he had metastatic liver cancer, or that that the cancer could have been caused by the failure of the defendant's medical staff to recommend and provide treatment for his liver disease, or to ensure that he was monitored sufficiently closely to detect the cancer at an earlier stage. As the Supreme Court observed in *Kubrick*, the fact that a plaintiff "has been injured *in fact may be unknown or unknowable until the injury manifests itself*; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *Kubrick*, 444 U.S. at 122. There is nothing in the record to suggest that the injury here — fatal liver cancer — manifested itself at any time before March 2013.

The government is not entitled to summary judgment on the basis of the statute of limitations.

B.  Sufficiency of Substantive Evidence

As noted above, the Michigan substantive law of medical malpractice sets out the elements of the plaintiff's claim in this case.  *See Amlotte v. United States*, 292 F. Supp. 2d 922, 924-25 (E.D. Mich. 2003); *1200 Sixth St., LLC v. U.S. ex rel. Gen. Servs. Admin.*, 848 F. Supp. 2d 767, 772 (E.D. Mich. 2012).  Under Michigan law, the "plaintiff in a medical malpractice action 'bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury.  Failure to prove any one of these elements is fatal.'"  *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 467 Mich. 1, 10-11, 651 N.W.2d 356, 361 (2002) (quoting *Wischmeyer v. Schanz*, 449 Mich. 469, 484, 536 N.W.2d 760, 767 (1995)).

The government contends that, because Nurse Cass's testimony must be excluded, the plaintiff cannot establish a breach of the standard of care; and because Dr. Bacon's testimony must be excluded, and because the plaintiff has not named any other causation expert, his claim for medical negligence cannot be sustained, because he has no presentable expert evidence to establish that his death was caused by the defendant's negligence.

"A hospital may be 1) directly liable for malpractice, through claims of negligence in supervision of staff physicians as well as selection and retention of medical staff, or 2) vicariously liable for the negligence of its agents."  *Ibid.*  Michigan has defined statutory criteria for proving the standard of care for a physician in general or specialist practice, *see* Mich. Comp. Laws 600.2912a, but that provision "by its plain language, does not apply to nurses."  *Id.* at 18, 651 N.W.2d at 365. Accordingly, "the applicable standard of care [in a malpractice action involving a nurse] is the skill

-24-

and care ordinarily possessed and exercised by practitioners of the profession in the same or similar localities." *Id.* at 21-22, 651 N.W.2d at 366-67.

The plaintiff has offered sufficient testimony by Nurse Cass for the Court to conclude that the applicable standard of care required Nurse Sheila Behler to (1) review the lab results and records of the decedent's previous visits to the hospital on each of the four occasions when he visited the hospital for examination and treatment; (2) inform the decedent that he had tested positive for Hepatitis B at the earliest on or around December 13, 2006, and certainly during any of his subsequent visits with her; and (3) refer the decedent for other appropriate follow-up or specialist care to treat or, at the least, monitor the progress of his liver disease, and perform regular imaging studies to detect any nascent cancer that might develop as the disease progressed. Nurse Behler's candid *mea culpa* to the decedent in 2013 suffices to show that she violated that standard of care.

The plaintiff has submitted testimony by Dr. Bacon tending to prove that Nurse Behler's failure to take any steps to inform the decedent of his diagnosis or to secure follow-up care and monitoring for his liver disease caused him to contract liver cancer that was not diagnosed until it had progressed to a fatal stage. If the Court accepts that testimony at trial, then it readily could conclude that the failure to give appropriate treatment and monitoring proximately caused Redmond's early demise from Stage IV liver cancer. For the reasons discussed above, all of the necessary expert testimony offered by the plaintiff is sufficiently authoritative and well founded to be presented at trial, and the government's argument that the case should be dismissed for lack of any admissible evidence on causation therefore is without merit.

### C.  Comparative Fault

Michigan Compiled Laws § 600.6304 "generally provides that the trier of fact in a tort action shall determine by percent the comparative negligence of all those who are a proximate cause of the plaintiff's injury and subsequent damages." *Shinholster v. Annapolis Hosp.*, 471 Mich. 540, 549, 685 N.W.2d 275, 280 (2004).  "Moreover, [Mich. Comp. Laws § 600.6304(6)] expressly acknowledges that a plaintiff may be determined 'to have fault' in 'a medical malpractice claim.'" *Id.* at 551 n.4, 685 N.W.2d at 281 n.4.  If a plaintiff's comparative fault "is greater than the aggregate fault of the other person or persons [at fault]," i.e. more than 50 percent, the court must reduce the plaintiff's economic damages by that percentage, and "noneconomic damages shall not be awarded."  Mich. Comp. Laws Ann. § 600.2959.

The government has not submitted evidence sufficient to show without dispute that the decedent was more than 50 percent at fault for his untimely death, and it certainly has not shown that the record is so one-sided on this point that the Court must render judgment as a matter of law in its favor, barring the plaintiff from recovering any non-economic damages.  For the reasons noted above, the evidence from the decedent's 2002 records does not compel the conclusion — and it certainly does not establish as a matter of law — that the decedent had Hepatitis B at any time before his records show that he first was diagnosed in December 2006.  Moreover, even if he did have the disease at that time, the government has not offered any medical testimony to sustain its hypothesis that the span of time over which a patient has Hepatitis B gives rise to any valid inference about the extent of any causal connection between that disease and any following liver cancer.  The plaintiff's expert testified that the causal link between liver disease and liver cancer is well established.  But he also testified that the principal tasks in appropriately managing a patient in Redmond's situation

are (1) to treat the liver disease in an attempt to eliminate the risk; and (2) to carefully monitor the condition of his liver with appropriate imaging studies as long as the disease persists, so that any cancer that may develop can be caught and treated as early as possible. The government has not presented any evidence sufficient to compel the conclusion that the efficacy of those efforts if applied to the decedent's condition between 2006 and 2013 would have been in any way diminished simply because he may have had liver disease for some time before then.

The principal negligence alleged in this case is the failure by the defendant's medical staff to take appropriate action to treat and monitor the decedent's liver disease after laboratory tests positively showed that he had it in 2006. There is nothing in the record that establishes — or even suggests — that the decedent had liver cancer at or before the time of that diagnosis. There certainly is nothing to compel the conclusion that, if he did have any cancer, it was so far advanced that it could not have been treated with a better outcome than eventually was obtained in 2013, when the decedent was found to have a liver mass so large that treatment options such as resection and transplant were ruled out. Moreover, Nurse Behler testified that she told the decedent in December 2006 that his lab results were "normal." That, coupled with the extensive information presented by the government suggesting that Hepatitis B can, in many cases, spontaneously resolve without treatment, certainly would allow the Court to conclude at trial that the decedent reasonably believed in 2006 that he did not have any liver disease, and that he continued in that belief until Nurse Behler informed him of her oversight in 2013, after he was diagnosed with the cancer that soon thereafter caused his death. If the plaintiff did not know, or have reason to know, that he had Hepatitis B at any time between 2006 and 2013, then he cannot be faulted for any neglect in seeking treatment for the disease.

-27-

Finally, the government's argument that the decedent was remiss for failing to seek treatment for his Hepatitis B for 12 years disregards the undisputed evidence that he *did seek treatment*, from the defendant and its medical staff, numerous times, over a span of years, from 2002 through 2013. The medical records tend to show that the defendant's staff knew, or should have known, on each of those occasions, that they should have been doing considerably more than what they did to treat and monitor Redmond's liver condition.  Instead, they did nothing, and they did not tell him at any point that he should be doing anything more.  The government evidently believes that a hospital and it staff may be absolved of liability for failing to deliver needed care because the patient might have gotten it from some other caregiver in the meantime, even though he never was advised by anyone of any diagnosis that would suggest a need for further steps.  That argument is not supported by any recognized legal theory that the Court is aware of.

The government is not entitled to summary judgment on its comparative fault defense.

## IV.  Conclusion

The Court does not find a basis to exclude the testimony of the plaintiff's proposed expert witnesses.  However, the government is entitled to take a second discovery deposition of Dr. Bruce Bacon.  Fact questions preclude summary judgment for the defendant.

Accordingly, it is **ORDERED** that the defendant's motions to prohibit the plaintiff's proposed expert witnesses from testifying at trial [dkt. #14, 25] are **DENIED**.

It is further **ORDERED** that the plaintiff must make Dr. Bacon available to the defendant for a second deposition at a time and place that is mutually agreeable to the parties.  The plaintiff must bear the expenses of that deposition, including the professional fees of Dr. Bacon and the travel expenses of government counsel.

It is further **ORDERED** that the defendant's motion for summary judgment [dkt. #15] is

**DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 11, 2016

<div style="border:1px solid black;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 11, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI

</div>